UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FLAWLESS STYLE LLC and FLORIDAHUSKER LLC, <br><br> Plaintiffs, <br><br> -v.- <br><br> SAADIA GROUP LLC, <br><br> Defendants. | 23 Civ. 2354 (JHR) <br><br> OPINION AND ORDER |

JENNIFER H. REARDEN, District Judge:

Before the Court is Flawless Style LLC ("Flawless") and FloridaHusker LLC's ("Husker") (collectively, "Plaintiffs") motion for a preliminary injunction to prevent Saadia Group LLC's ("Defendant") continued use of the GABRIELLE UNION trademark and any manufacturing, distributing, and/or selling of goods bearing that mark. ECF No. 17 ("Pls. Mot."). For the reasons set forth below, Plaintiffs' motion is GRANTED.

## I.  BACKGROUND

Plaintiffs are entities wholly owned by the actor and author Gabrielle Monique Union-Wade. ECF No. 21 ("Union Decl.") ¶ 1. Through Husker, Union owns two registrations of the GABRIELLE UNION mark for use in various clothing items. *Id.* ¶ 11; *see also* ECF No. 11-1 ("Trademark Registrations").

In 2017, Union launched a GABRIELLE UNION fashion brand in partnership with the clothing retailer New York & Company. Union Decl. ¶ 12. In 2019, she expanded her line to Fashion to Figure, another retailer. *Id.* at ¶ 13. After their corporate parent went bankrupt, both New York & Company and Fashion to Figure were purchased by Defendant, which later acquired Lord & Taylor. *Id.* ¶ 14-15.

In Summer 2021, through Flawless, Union negotiated a License and Spokesperson Agreement with Defendant, *see* ECF No. 20-1 ("Agreement"),[1] permitting Defendant to use Union's name, brand, likeness, and trademarks[2] to relaunch the GABRIELLE UNION line at Lord & Taylor, New York & Company, and Fashion to Figure as long as Union first approved, *inter alia*, the merchandise's design, packaging, and use of her mark and was paid certain guaranteed royalty payments.[3]  Union Decl. ¶¶ 16, 18, 20; *see also* Agreement §§ 3, 7, 8.  The line was released at New York & Company and Lord & Taylor in September 2021 and at Fashion to Figure in March 2022.  ECF No. 21-1 ("Press Coverage").[4]

Beginning in May 2022, Defendant failed to make royalty payments and other professional fees owed under the Agreement.  Union Decl. ¶ 23.  On February 9, 2023, Flawless warned Defendant that, "[u]nless such non-compliance is cured within fifteen (15) business days, . . . the Agreement may be terminated."  ECF No. 20-2 ("Notice of Breach") at 3.  After Defendant did not respond and failed to cure its breach, Flawless wrote again on March 7, 2023, notifying Defendant that it had "failed to cure" its "material breach of the Agreement" and that, pursuant to Section 18(a), the Agreement was "terminated, effective immediately."  ECF No. 20-

---

[1] Capitalized terms not otherwise defined herein retain their meaning under the Agreement.

[2] Although Section 2 of the Agreement appears to grant the use of "trademarks," only the GABRIELLE UNION mark is specifically referenced in the Agreement.  In any event, the GABRIELLE UNION mark is the sole mark at issue.

[3] Consistent with its terms, the Agreement will be interpreted under New York law.  *See* Agreement § 21 ("The validity, interpretation and performance of this Agreement shall be determined in accordance with the local laws of the State of New York, without application of its conflicts of laws rules.").

[4] Defendant repeatedly contends, without evidence, that the Fashion to Figure line did not release until March 2023.  *See, e.g.*, ECF No. 33 ("Saadia Decl.") ¶ 11 ("The Plaintiffs' conduct also caused the launching of Fashion-To-Figure site scheduled for fall of 2021 to be scrapped and be delayed by close to a year and half until March of 2023.").  Plaintiffs have submitted press showing that the line launched in March *2022*.  Press Coverage 6, 9.

3 ("Termination Letter") at 1.  Rather than "immediately ceas[ing]" the sale of GABRIELLE UNION merchandise, as required by Section 18(b)(i) of the Agreement, Defendant continued selling Collection Merchandise through its websites—at up to seventy percent markdowns.

Plaintiffs filed this action on March 20, 2023, alleging breach of contract and seeking an injunction to prevent Defendant's ongoing sale of Collection Merchandise.  ECF No. 1 ("Compl.").  On April 6, 2023, Plaintiffs amended their complaint to add, *inter alia*, two claims for trademark infringement.  ECF No. 11 ("Am. Compl.").  That same day, counsel for Plaintiffs wrote to counsel for Defendant, stating that Plaintiffs would move for a temporary restraining order and preliminary injunction if, by 5:00 p.m. the following day, Defendant did not provide "verifiable confirmation that all such sales have ceased."  ECF No. 20-4 ("Apr. 6, 2023 Email"). On Friday, April 14, 2023, Plaintiffs' counsel wrote a second time, informing opposing counsel that Plaintiffs would move for injunctive relief on the coming Monday.  ECF No. 20-5 ("Apr. 14, 2023 Email").

On Monday, April 17, 2023, Plaintiffs moved for a temporary restraining order and preliminary injunction.  Pls. Mot.  Initially, Defendant "consent[ed] to having a TRO and preliminary injunction placed throughout the pendency of this action."  ECF No. 26 at 1 ("Letter Resp.").  During a hearing on April 19, 2023, however, it became clear that the parties did not, in fact, agree on the terms of an injunction.  Plaintiffs and Defendant submitted competing proposed orders, and on April 21, 2023 at 6:27 p.m., the Court entered a temporary restraining order.  The temporary restraining order prohibited Defendant from using the GABRIELLE UNION mark, including on its websites, and from selling Collection Merchandise, unless Defendant first removed "labels, tags[,] packaging and/or devices" "bearing the Artist Identification."  ECF No. 31 ("TRO").  Defendant then opposed Plaintiffs' application for a preliminary injunction.  *See* ECF No. 35 ("Opp. Br.").  During a proceeding on May 3, 2023, the

3

Court heard argument on Plaintiffs' application. At the conclusion of that proceeding, the temporary restraints were extended, for good cause, until May 19, 2023, and again on May 19, at 3:58 p.m., until May 26, 2023, at 9:00 p.m.

## II. DISCUSSION

"A party seeking a preliminary injunction must demonstrate: (1) a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tips in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction." *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (quotation marks and alteration omitted) (citing *Salinger v. Colting*, 607 F.3d 68, 79-80 (2d Cir. 2010)). Plaintiffs have satisfied this standard.

### A. Likelihood of Success

Plaintiffs bring two trademark claims: one, under 15 U.S.C. § 1114, for infringement, and a second, under 15 U.S.C. § 1125(a), for false designation of origin.

#### 1. The Expiration of Defendant's License

When a licensor terminates a trademark licensing "[a]greement[] in accordance with [its] terms," the continued use of the mark is "unlicensed and unlawful under the Lanham Act." *Krispy Kreme Doughnut Corp. v. Satellite Donuts, LLC*, 725 F. Supp. 2d 389, 393 (S.D.N.Y. 2010) (enjoining franchisee's use of franchisor's mark); *see also Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 25 (2d Cir. 2004) ("The continued use by the defendants of a licensed trademark after the Franchise Agreement had been terminated constitutes . . . trademark infringement." (quoting *Baskin-Robbins Ice Cream Co. v. D & L Ice Cream Co., Inc.*, 576 F. Supp. 1055, 1060 (E.D.N.Y. 1983)).

4

Under the Agreement, "[e]ither party" could terminate it "immediately upon written notice in the event of the other party's material breach . . . and failure to cure such breach within fifteen (15) business days after receipt of written notice from the non-breaching party." Agreement § 18(a). If the Agreement was terminated for reasons other than Defendant's material breach, Defendant retained sell-off rights allowing it, for six months, "to complete manufacture of Collection Merchandise then in process, and to continue to sell in the Territory its existing inventory of Collection Merchandise then completed" or already in stock, as long as the merchandise "compl[ied] with the quality control provisions and written approvals." Agreement § 18(b)(ii). Otherwise, Defendant was to "immediately cease and cause the cessation of all of its activities . . . respecting the Collection and any Materials incorporating the Artist Identification." Agreement § 18(b)(i).

Rather than dispute its alleged material breaches of the Agreement, Defendant argues that *Plaintiffs* materially breached first (along with breaching their covenant of good faith and fair dealing), thereby terminating the Agreement and triggering Defendant's contractual sell-off rights. *See* Agreement § 18(b)(ii). Specifically, Defendant argues that Plaintiffs materially breached when they and Union (1) "would continuously and unjustifiably delay giving . . . approvals and consistently make unreasonable denials and unreasonable modifications," delaying the launch of the Fashion to Figure website and "caus[ing] extensive loss[es]," Opp. Br. 5-6; (2) "failed to promote the Lord & Taylor website" and to make the requisite "monthly social posts," *id.* at 6; (3) "abused the licensing agreement" by using manicurists, hair stylists, and photographers who charged high rates, costing Defendant "hundreds of thousands of dollars," *id.* at 7-8; and (4) "refuse[d] to work with certain individuals . . . not based on their merit and unrelated to achieving the objective at hand," *id.* at 8.

5

Defendant's evidence for these allegations borders on nonexistent.[5]  Indeed, its purported support only undermines Defendant's claims.  First, all of the email communications filed as Exhibits A, B, and D to the Declaration of Jack Saadia, Defendant's principal, ECF No. 33 ("Saadia Decl."), reflect Union's unavailability due to competing "professional commitments."[6]  Under the Agreement, however, "[i]n no event w[ould] Licensor or Artist be deemed in breach . . . due to Artist's unavailability . . . as a result of a professional commitment."  Agreement § 3(i)(i).  Second, far from showing that Union was unavailable or had delayed in giving approvals, the email from Sarah Cohn of New York & Company to Jack Saadia at Exhibit C reflects that Union had "spent more than the allotted time," resulting in Defendant "g[etting] the approvals that [it] needed."  ECF No. 33-3 ("Apr. 5, 2022 Email").  Third, Defendant provides no evidence that the fees included in the professional services invoices attached as Exhibit E

---

[5] Moreover, both cases cited by Defendant for the proposition that "Plaintiffs are not entitled to recover based on an alleged breach by Defendant that was in effect proximately caused by the Plaintiffs themselves," Opp. Br. 7, address claims for damages, not injunctive relief, and therefore are inapposite.  *See Milton v. Hudson Riv. Steamboat Co.*, 37 N.Y. 210, 214 (1867) ("When a claim to further damages is preferred, the question at once arises, did the damages claimed flow directly from a breach of the contract or was it a remote result, or was it caused or aggravated by the conduct of the plaintiff?"); *RCN Telecom Servs., Inc. v. 202 Ctr. St. Realty LLC*, 156 Fed. App'x 349, 351 (2d Cir. 2005) ("causation is an essential element of damages in a breach of contract action; and, as in tort, a plaintiff must prove that a defendant's breach *directly and proximately caused* his or her damages" (cleaned up)).

[6] Exhibit A, for instance, states that Union's availability "depend[ed] on her filming schedule which changes day by day."  ECF No. 33-1 ("Jun. 25, 2021 Email").  Exhibit B similarly states that Union's unavailability was due to her "filming full days every week until July 28th," and that Union requested to have a particular meeting "after she wraps."  ECF No. 33-2 ("Jun. 23, 2021 Email").  Although the reason for Union's unavailability to discuss the "2023 footwear summer collection" is not clear from the email thread at Exhibit D, ECF No. 33-4 ("Sep. 8, 2022 Email"), Union has attested that it was "due to filming or other professional obligations," *see* ECF No. 38 ("Union Reply Decl.") ¶ 7.

were "exuberant" (other than Mr. Saadia's say so), Saadia Decl. ¶ 25, let alone evidence that the fees exceeded what is "customary in the commercial industry," Agreement § 4(j).[7]

Of note, Defendant fails to proffer any evidence of having notified Plaintiffs or Union of any alleged breaches prior to the filing of this litigation. In fact, Defendant does not seem to have asserted any breaches until after the temporary restraining order issued. During oral argument on May 3, 2023, counsel for Defendant averred—for the first time—that it had indeed "expressed" such "complaints" to Plaintiffs, though perhaps "mostly verbally." ECF No. 46 ("Prelim. Inj. Hr'g Tr.") at 7. Even if Defendant had done so, a "verbal" notice is insufficient to terminate the Agreement. *See* Agreement § 18(a) ("Either party may terminate this Agreement immediately upon *written notice* in the event of the other party's material breach . . . and failure to cure such breach within fifteen (15) business days." (emphasis added)). Under New York law, subject to exceptions not relevant here, "where contracting parties agree on a termination procedure, the procedure will be enforced as written." *E. Empire Constr. Inc. v. Borough Constr. Grp. LLC*, 200 A.D.3d 1, 5 (N.Y. App. Div. 1st Dep't 2021) (citing *Gen. Supply & Constr. Co. v. Goelet*, 241 N.Y. 28, 34 (1925)).

Also on May 3, 2023, Defendant argued for the first time that an evidentiary hearing "is necessary because . . . there are various breaches . . . [s]o we need to have an evidentiary hearing with respect to . . . the breach on the part of the licensor." Prelim. Inj. Hr'g Tr. 18-19. That application is denied.

To start, Defendant does not "explain how additional oral testimony by its witnesses or additional information that might be gleaned from an evidentiary hearing would materially

---

[7] Defendant similarly lacks evidence of Union's supposed failure to promote the Lord & Taylor website and refusal to work with certain individuals.

7

change the record." *24 Seven, LLC v. Martinez*, No. 19 Civ. 7320 (VSB), 2021 WL 276654, at *13 (S.D.N.Y. Jan. 26, 2021). Regardless, "[a]n evidentiary hearing is not required when the relevant facts . . . are not in dispute . . . or when the disputed facts are amenable to complete resolution on a paper record." *Charette v. Town of Oyster Bay*, 159 F.3d 749, 755 (2d Cir. 1998) (citations omitted). Here, no relevant facts are in dispute. Instead, the scant evidence adduced by Defendant simply does not show what Defendant claims. Even if it did, an evidentiary hearing still would not be warranted. As Defendant concedes, in the face of Plaintiffs' supposed breaches, Defendant elected to continue, rather than terminate, the Agreement. *See Caronia v. Hustedt Chevrolet, Inc.*, No. 05 Civ. 3526 (DRH) (MLO), 2009 WL 3615289, at *2 (E.D.N.Y. Oct. 30, 2009) ("[B]ecause the question presented to the court is solely . . . a question of law, an evidentiary hearing is not required." (citing *Charette*, 159 F.3d at 755)).

It is legion that, "[w]here a contract is broken in the course of performance, the injured party has a choice presented to him of continuing the contract or of refusing to go on. . . . If the injured party chooses to go on, he loses his right to terminate the contract because of the default." *Emigrant Indus. Sav. Bank v. Willow Builders*, 290 N.Y. 133, 144 (1943) (cleaned up); *see also ESPN, Inc. v. Off. of the Comm'r of Baseball*, 76 F. Supp. 2d 383, 387-88 (S.D.N.Y. 1999) (collecting cases). In other words, Defendant may not have its cake and eat it too. According to Defendant's own evidence, it intentionally elected to accede to Union's demands and continue—rather than terminate—the Agreement, in order "to preserve the peace and the relationship with" Plaintiffs and Union. Saadia Decl. ¶¶ 27, 30; *see also id.* ¶ 13 ("despite Plaintiffs' conduct, Defendant was still paying the Plaintiffs"). As a matter of law, when Defendant continued selling GABRIELLE UNION merchandise despite Plaintiffs' alleged breach of the Agreement, Defendant elected to continue the contract and was therefore obligated to continue performing under it. Thus, Plaintiffs were within their rights to later terminate the

Agreement due to Defendant's material breach, thereby stripping the sell-off rights that are only available "[s]o long as th[e] Agreement has not been terminated due to material breach by Saadia." Agreement § 18(b)(ii).

Because the sell-off provision did not apply, Defendant was required to "immediately cease and cause the cessation of all of its activities . . . respecting the Collection and any Materials incorporating the Artist Identification." *Id.* § 18(b)(i). When it nonetheless continued using the GABRIELLE UNION mark, it no longer did so as a licensee. Accordingly, its use was without permission.[8]

### 2. 15 U.S.C. §§ 1114 and 1125(a)

The next step in the analysis is to determine whether liability likely lies under 15 U.S.C. §§ 1114 (for infringement) and 1125(a) (for false designation of origin). Under both provisions, the test for establishing liability is the same: the mark must be "entitled to protection," and Defendant's "use of the mark" must be "likely to cause consumers confusion as to the origin or sponsorship of [its] goods." *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003).

"A certificate of registration with the PTO is prima facie evidence that the mark is registered and valid (*i.e.*, protectible), that the registrant owns the mark, and that the registrant has the exclusive right to use the mark in commerce." *Lane Cap. Mgmt., Inc. v. Lane Cap. Mgmt., Inc.*, 192 F.3d 337, 345 (2d Cir. 1999) (citing 15 U.S.C. § 1115(a)). Here, Plaintiffs have

---

[8] Defendant's argument that it is permitted to continue selling Collection Merchandise attaching labels, hangtags, and packaging (*i.e.*, Collateral Materials) fails. The clause permitting the continued "use, display, exhibit[ing], or otherwise exploit[ing of] . . . Collateral Materials that are affixed to the Collection Merchandise" only applies "during the Sell-Off Period," which, as previously explained, was not available here because the Agreement was terminated due to Defendant's material breach. Agreement § 18(b)(iv) ("Upon expiration or earlier termination of this Agreement: . . . Saadia will not use, display, exhibit or otherwise exploit any Materials containing Artist Identification during the Sell-Off Period except for Collateral Materials that are Affixed to the Collection Merchandise.").

9

submitted two certificates of Husker's registration of the GABRIELLE UNION mark. *See* Trademark Registrations. Thus, Plaintiffs have established that the mark is "entitled to protection."

Courts in the Second Circuit typically use the Polaroid Factors to assess the likelihood of consumer confusion. *See Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961). In the licensing context, however, "likelihood of confusion is presumed when an ex-licensee continues to use a mark after its license expires." *Team Rubicon Glob., Ltd. v. Team Rubicon, Inc.*, No. 20 Civ. 2537 (LTS) (KNF), 2020 WL 2539117, at *6 (S.D.N.Y. May 19, 2020) (quotation and alteration omitted), *aff'd*, 828 Fed. App'x 74 (2d Cir. 2020). As previously explained, because Defendant continued to use the GABRIELLE UNION mark after its license had expired, a likelihood of consumer confusion is presumed.

Plaintiffs have shown that Defendant's use of the GABRIELLE UNION mark was without authorization, that the mark is entitled to protection, and that Defendant's use is likely to cause consumer confusion. Therefore, Plaintiffs have established a strong likelihood of success on the merits of their trademark claims.

**B.      Irreparable Harm**

Having established a likelihood of success, Plaintiffs are "entitled to a rebuttable presumption of irreparable harm." 15 U.S.C. § 1116(a); *see also Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38, 42 (2d Cir. 1986) ("When in the licensing context unlawful use and consumer confusion have been demonstrated, a finding of irreparable harm is automatic."); *id.* at 43 ("irreparable harm *always* flows from unlawful use and confusion"). Indeed, "[t]he unauthorized use of a mark by a former licensee invariably threatens injury to the economic value of the goodwill and reputation associated with a licensor's mark." *Id*.

In opposition, Defendant principally argues that "Plaintiffs and Ms. Union will not be harmed by the sale of the referenced products . . . since the Collection Merchandise are approved by the Plaintiff as per the licensing agreement [and] . . . Plaintiff's approval signifies that the Plaintiff has already vetted the quality and design of the Collection Merchandise bearing the intellectual property." Opp. Br. 10.  That theory was rejected in *Church of Scientology*.  To establish irreparable harm, Plaintiffs need not show that Defendant "had *in fact* reduced the reputation associated with the marks." 794 F.2d at 44.  Instead, "the mere possibility that defendant[] could during the interval until trial depart" from the previous approvals "is sufficient to warrant the issuance of a preliminary injunction." *Id.*  "[I]t is that loss of control which is the very thing that constitutes irreparable harm in the licensing context," *id.*, and such "loss of control" is "neither calculable nor precisely compensable," *Barefoot Contessa Pantry, LLC v. Aqua Star (USA) Co.*, No. 15 Civ. 1092 (JMF), 2015 WL 845711, at *7 (S.D.N.Y. Feb. 26, 2015) (quoting *NYP Holdings v. N.Y. Post Pub'g Inc.*, 63 F. Supp. 3d 328, 341 (S.D.N.Y. 2014)).

Finally, in its Proposed Findings of Fact and Conclusions of Law, Defendant raises a new argument: that Plaintiffs have "undu[ly] delay[ed] in seeking a preliminary injunction from the time that the Defendant allegedly breached the [Agreement]." ECF No. 44 ("Defendant's Proposed Findings of Fact and Conclusions of Law") at 12-13, 14 (relying heavily on *Life Techs. Corp. v. AB Sciex Pte. Ltd.*, No. 11 Civ. 325 (RJH), 2011 WL 1419612 (S.D.N.Y. Apr. 11, 2011)).  In so doing, Defendant misreads *Life Technologies Corp.*  There, in finding no irreparable harm, the Court cited a significant delay in seeking injunctive relief.  At issue, however, was run-of-the-mill trademark infringement, which arose when the defendant used the plaintiff's mark on products not covered by the license at issue.  *See* 2011 WL 1419612, at *3 (Defendant's "inside counsel called [Plaintiff's] inside counsel to ask whether [Plaintiff] would expand the trademark license to cover reagents; [Plaintiff's] counsel replied that it would not;"

11

later, "Plaintiff[] noticed that [Defendant] was using the [marks] in connection with reagents" but waited nine months before seeking injunctive relief). Here, in contrast, the "compelling need for injunctive relief" arose "after a license ha[d] been revoked" and the ex-licensee nevertheless continued using the mark. *Sunward Elecs., Inc.*, 362 F.3d at 25 (citing *Church of Scientology*, 794 F.2d at 41-42). The time between Plaintiffs' termination of the Agreement and motion for injunctive relief was less than six weeks.

C. **Balance of Hardships**

Defendant claims it will suffer tremendous harm if a preliminary injunction issues, including "millions of dollars in losses" and the termination of "about thirty to forty-five employees." Saadia Decl. ¶¶ 38-41; *see also* ECF No. 34 ("Claravall-Nordling Decl.") ¶¶ 10-12. Those allegations are neither supported nor credible, given that the Collection Merchandise constituted only one of numerous lines sold on Defendant's websites. Moreover, "the law does not protect" the hardship arising from "the loss of the chance to" promote infringing products. *IGT v. High 5 Games, LLC*, 17 Civ. 9792 (ALC), 2018 WL 1374265, at *2 (Mar. 16, 2018) (quoting *Warner Bros. Enter. Inc. v. RDR Books*, 575 F. Supp. 2d 513, 553 (S.D.N.Y. 2008)); *see also 3M Co. v. Performance Supply, LLC*, 458 F. Supp. 3d 181, 197 (S.D.N.Y. 2020) ("It would not be a 'hardship' for Defendant to refrain from engaging in unlawful activities related to [Plaintiffs'] brand."). Accordingly, the balance of hardships weighs in Plaintiffs' favor.

D. **Public Interest**

A preliminary injunction prohibiting an ex-licensee from continuing to use a mark is in the public interest because "[c]onsumers have already associated some significant source identification with the licensor," meaning "the potential for consumer confusion is greater than in the case of a random infringer." *Church of Scientology*, 794 F.2d at 44. "In this way the use of a mark by a former licensee confuses and defrauds the public." *Id.*

### E. Bond

As previously explained, Defendant's "claims . . . of potential injury . . . [are] inflated and provide[] no real basis for fixing the amount of security to be required." *Cherry River Music Co. v. Simitar Ent., Inc.*, 38 F. Supp. 2d 310, 323-25 (S.D.N.Y. 1999). Defendant "gave no support," *id.*, for its claims that it will lose "millions of dollars" and be forced to lay off "thirty to forty-five employees," Saadia Decl. ¶¶ 38-41; *see also* Claravall-Nordling Decl. ¶¶ 10-12—"and the figures obviously are inflated," *Cherry River Music Co.*, 38 F. Supp. 2d at 323-25. Given the "strong evidence that [Defendant] has infringed [Plaintiffs' trademark]," and Defendant's "failure to provide substantial reason to believe that it will succeed at trial," *Spin Master, Ltd. v. E. Mishan & Sons, Inc.*, No. 19 Civ. 9035 (DLC), 2019 WL 6681563, at *19 (S.D.N.Y. Dec. 6, 2019), the Court sets a bond of $250,000. *See Cherry River Music Co.*, 38 F. Supp. 2d at 323-25 (rejecting defendant's unsupported claim that a preliminary injunction would cost it $10 million and imposing a bond in the amount of $250,000).

### III. CONCLUSION

For the reasons stated above, Plaintiffs' motion for a preliminary injunction, ECF No. 17, is GRANTED. The restraints set forth in the Temporary Restraining Order, ECF No. 31, shall remain in place through the pendency of this litigation.

The Clerk of Court is directed to terminate ECF No. 17.

SO ORDERED.

Dated: May 26, 2023
New York, New York

*[Signature]*
JENNIFER H. REARDEN
United States District Judge