UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

FLAWLESS STYLE LLC and
FLORIDAHUSKER LLC,

                     Plaintiffs,

      -v-                             No.  23-CV-2354-LTS

SAADIA GROUP LLC,

                     Defendant.

--------------------------------------------------------x

<u>MEMORANDUM OPINION AND ORDER</u>

      Plaintiffs Flawless Style LLC ("Flawless") and FloridaHusker LLC ("Husker")

bring this action against Defendant Saadia Group LLC ("Saadia" or "Defendant"), asserting

claims of breach of contract and infringement of federal trademarks.  Plaintiffs seek damages for

breach of contract, reasonable attorneys' fees and costs, and a permanent injunction barring

Defendant from further use of Husker's trademarks.  Currently before the Court are Plaintiffs'

Motion for Default Judgment (docket entry no. 86 ("Plaintiffs' Motion for Default Judgment")),

Plaintiffs' Motion to Dismiss counterclaims and strike affirmative defenses (docket entry no. 54

("Plaintiffs' Motion to Dismiss")), Plaintiffs' Motion for Sanctions (docket entry no. 62

("Plaintiffs' Motion for Sanctions")), and Defendant's Cross-Motion for Sanctions (docket entry

no. 69 ("Defendant's Cross-Motion for Sanctions")).  The Court has subject matter jurisdiction

of the action under Section 39 of the Lanham Act, 15 U.S.C. section 1121, and under 28 U.S.C.

sections 1331, 1338(a), and 1367.

      The Court has thoroughly reviewed the parties' submissions, including Plaintiffs'

unopposed submissions in support of default judgment.  For the reasons stated below, the Court

(1) grants in part and denies in part Plaintiffs' Motion for Default Judgment and strikes Defendant's Answer in its entirety; (2) terminates Plaintiffs' Motion to Dismiss as moot in light of Defendant's stricken Answer; (3) grants in part and denies in part Plaintiffs' Motion for Sanctions; and (4) denies Defendant's Cross-Motion for Sanctions.

BACKGROUND

The Court assumes the parties' familiarity with the general context and procedural history of this case. The following factual recitation is drawn from Plaintiffs' Amended Complaint (docket entry no. 11 ("Amended Complaint" or "Am. Compl.")), Plaintiffs' unopposed memorandum of law in support of default judgment (docket entry no. 88 ("Pls. MDJ Mem")), and the Court's May 26, 2023, Preliminary Injunction (docket entry no. 52 ("Preliminary Injunction" or "PI")).[1]

Plaintiffs are entities that are wholly owned by actor and author Gabrielle Monique Union-Wade ("Ms. Union"). (Am. Compl. ¶ 13.) In the summer of 2021, Ms. Union negotiated a negotiated a License and Spokesperson Agreement with Defendant on behalf of Flawless. (Docket entry no. 19-1 (the "Agreement")).[2] This Agreement granted Defendant a license to use Ms. Union's name, brand, voice, likeness, and biography, as well as the GABRIELLE UNION trademark, in connection with a line of fashion products ("Collection Merchandise") to be launched at Lord & Taylor, New York & Company, and Fashion to Figure.

---

[1]    As explained below, in light of Defendant's default, all of Plaintiffs' well-pleaded factual allegations are accepted as true for the purposes of this motion practice. See Fed. R. Civ. P. 8(b)(6); Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992) ("[A] party's default is deemed to constitute a concession of all well pleaded allegations of liability."). Citations to the Court's Preliminary Injunction incorporate by reference the Court's citations to underlying evidentiary submissions.

[2]    Capitalized terms not otherwise defined herein retain their meaning under the Agreement.

(Am. Compl. ¶¶ 19-20.)  Husker owns the GABRIELLE UNION trademarks licensed under the Agreement.  Defendant's license was subject to Ms. Union's prior approval of the designs and packaging of the merchandise, as well as the use of her mark.  (PI at 2.)  Under the Agreement, Defendant was required to provide several forms of payment in exchange for use of the license, including compensation for Flawless's and Ms. Union's work promoting and designing the merchandise ("Endorsement Compensation"), as well as certain minimum guaranteed royalty payments for each year of the Agreement ("Guaranteed Royalties").  (Am. Compl. ¶¶ 25-28; see also Agreement §§ 3, 7, 8.)[3]  Defendant was also required to pay the invoices of multiple third parties in connection with services under the Agreement.[4]  (Am. Compl. ¶¶ 77-85 (citing Agreement §§ 4(j), 4(k), 4(s)).  The line launched at New York & Company and Lord & Taylor in September 2021 and at Fashion to Figure in March 2022.  (PI at 2.)

Starting in May 2022, Defendant failed to make the quarterly Endorsement Compensation and Guaranteed Royalty payments it owed under the Agreement.  (Am. Compl. ¶¶ 49-50.)[5]  Flawless sent Defendant a notice of breach on February 9, 2023, warning Defendant that, unless its breaches were cured within fifteen business days, Flawless would be entitled to terminate the agreement.  (Id. ¶ 53.)  After Defendant did not respond and failed to cure its

---

[3]    Union had launched GABRIELLE UNION fashion brands with New York & Company in 2017 and Fashion to Figure in 2019; Defendant purchased both of those entities after their parent corporation went bankrupt.  (Docket entry no. 21 ¶¶ 12-13.)  Defendant later acquired Lord & Taylor.  (Id. ¶¶ 14-15.)

[4]    These third parties included make-up and hair artists, a manicurist, a creative consultant, and social media professionals.  (Am. Compl. ¶¶ 77-84.)

[5]    Defendant did, however, make a few unannounced and unexplained payments to Plaintiffs between 2021 and 2023 that totaled $673,087.19.  (Pls. MDJ Mem. at 21-22.)  Plaintiffs have subtracted these payments from the total damages they seek in this action.  (Id. at 22.)

breach, Flawless wrote to Defendant again on March 7, 2023, notifying Defendant that the Agreement was terminated pursuant to Section 18(a) thereof.  (PI at 2-3.)  Although Section 18(b)(i) of the Agreement required Defendant to "immediately cease" the sale of GABRIELLE UNION, Defendant continued to sell that merchandise.  (Id. at 3.)

Plaintiffs filed this action on March 20, 2023, asserting breach of contract claims and seeking an injunction (docket entry no. 1) and then amended their complaint on April 6, 2023, to add two claims for trademark infringement (Am. Compl.).  The Court entered a temporary restraining order a few weeks later (docket entry no. 31 ("Temporary Restraining Order" or "TRO")), which prohibited Defendant from "any further use of Plaintiffs' intellectual property, including in whole or in part the trademark 'GABRIELLE UNION,'" and from "[m]anufacturing, distributing or selling any Collection Merchandise."  (TRO at 1-2.)  The TRO also restrained Defendant from making "any use of the name 'Gabrielle Union'" and ordered Defendant to "remove all references to Plaintiffs' intellectual property from any website on which Collection Merchandise is sold" within ten business days.  (Id. at 1-2.)[6]  On May 26, 2023, the Court entered a preliminary injunction that extended all restraints set forth in the TRO through the pendency of this litigation.  (PI at 13.)

About six months after the Court entered the Preliminary Injunction, Plaintiffs moved to hold Defendant in contempt of court and sought sanctions based on Defendant's alleged violations of the TRO and the Preliminary Injunction.  (Docket entry no. 65 ("Pls. Sanctions Mem.")).  Plaintiffs alleged that Defendant had continued selling merchandise

---

[6]    Defendant was ordered to remove all references to Plaintiffs' intellectual property from the websites for Lord & Taylor, New York & Company, and Fashion to Figure even sooner—within three business days of the date of the TRO.  (TRO at 2.)

connected to Gabrielle Union's name on its New York & Company website and was selling Collection Merchandise that contained sewn-in GABRIELLE UNION tags through an online subscription and rental service called New York & Company Closet. (Pls. Sanctions Mem. at 4.) Defendant cross-moved for sanctions, claiming that "Plaintiffs made no effort to notify of any noncompliance with the TRO" before they moved for sanctions. (Docket entry no. 70 ("Def. Sanctions Mem.") at 10.)

In May 2024, Defendant's counsel Saadia Shapiro ("Mr. Shapiro") moved to withdraw from this case. (Docket entry no. 77.) The Court granted this request but ordered Defendant to secure new counsel by June 12, 2024, warning that Defendant would be in default if it failed to do so. (Docket entry no. 79 ("Withdrawal Order").) That same day, Mr. Shapiro filed an affidavit affirming that counsel had served Defendant with a true copy of the motion to withdraw and the Order requiring Defendant to secure new counsel. (Docket entry no. 80.)

Defendant, however, did not secure new counsel by the Court's deadline, and default was entered by the Clerk of Court on June 14, 2024. (Docket entry no. 85.) Plaintiffs then moved for default judgment on August 8, 2024 and, after being unable to effectuate service of that Motion for Default Judgment, moved for permission to serve Defendant via email. (Docket entry no. 94.) The Court granted that request on September 17, 2024, (docket entry no. 95), and Plaintiffs served Defendant and Mr. Shapiro, who was still representing Defendant in another case,[7] via e-mail on the same day (docket entry no. 96). To date, Defendant has not

---

[7]     That case was Phoenix Fashion, Inc. v. Saadia Group LLC et al, in which a default judgment was later granted against Defendant. No. 23-cv-5788-LJL, 2024 WL 4493716 (S.D.N.Y. Oct. 15, 2024).

secured new counsel, nor has it moved to set aside the default or responded to Plaintiffs' motion for default judgment. This case was transferred to the undersigned on April 28, 2025.

DISCUSSION

Motion for Default Judgment

Rule 55 of the Federal Rules of Civil Procedure establishes a two-step procedure for entering judgment by default against a party who fails to defend: first, entry of a default, and then entry of default judgment. Rule 55(a) of the Federal Rules of Civil Procedure provides that, when a party fails to "plead or otherwise defend" against an action seeking affirmative relief and that failure is shown by affidavit or otherwise, the clerk of court must enter the party's default. Fed. R. Civ. P. 55(a). A party may thereafter move for, and the district court may grant, judgment by default. Fed. R. Civ. P. 55(b); see also Berdini v. Nova Sec. Grp., No. 13-CV-5672-FB-CLP, 2015 WL 5540735, at *3 (E.D.N.Y. Sept. 2, 2015), report and recommendation adopted, No. 13-CV-5672-FB, 2015 WL 5541233 (E.D.N.Y. Sept. 18, 2015). Default judgment is "a final action by the district court in the litigation." Enron Oil Corp. v. Diakuhara, 10 F.3d 90, 95 (2d Cir. 1993).

Here, the clerk entered Defendant's default on June 14, 2024—over a year ago— and Defendant has neither appeared by new counsel nor otherwise sought relief from the default. (Docket entry no. 85.) Now, Plaintiffs have moved for a default judgment against Defendant, which is a limited liability company ("LLC"), for failing to appear by counsel. The Supreme Court has held that artificial entities may appear in federal court only through licensed counsel, Rowland v. California Men's Colony, Unit II Men's Advisory Council, 506 U.S. 194, 201-02 (1993), and the Second Circuit has expressly held that this requirement applies to LLCs, Lattanzio v. COMTA, 481 F.3d 137, 139-40 (2d Cir. 2007). Accordingly, it is "settled law" that,

when an LLC repeatedly fails to appear by counsel, "a default judgment may be entered against it pursuant to Rule 55 . . . ." Sec. & Exch. Comm'n v. Rsch. Automation Corp., 521 F.2d 585, 589 (2d Cir. 1975); see also Grace v. Bank Leumi Trust Co., 443 F.3d 180, 192 (2d Cir. 2006), cert. denied, 549 U.S. 1114 (2007). When a party has "willfully disregarded the district court's order" to obtain counsel, "[s]uch cavalier disregard for a court order is a failure, under Rule 55(a), to 'otherwise defend.'" Eagle Assocs. v. Bank of Montreal, 926 F.2d 1305, 1310 (2d Cir. 1991)) (internal quotation omitted). Thus, courts in this Circuit have held that when a corporate defendant violates a court order to appear by counsel, "it is also appropriate for a court to strike the answer and counterclaims of that defendant." Next Proteins, Inc. v. Distinct Beverages, Inc., No. 09-CV-4534-DRH-ETB, 2012 WL 314871, at *2 (E.D.N.Y. Feb. 1, 2012).[8]

Defendant clearly is in default under Rule 55(a). Defendant's prior counsel, Mr. Shapiro, withdrew pursuant to an unambiguous Withdrawal Order that informed Defendant of the need for representation, set a deadline for new counsel to make an appearance, and warned of default judgment as a consequence of failing to appear. (Withdrawal Order at 1-2.) Defendant had notice of the Withdrawal Order, as Mr. Shapiro served it upon Defendant on the day that it was entered, and Mr. Shapiro continued representing Defendant in another action. (Docket entry

---

[8]    See also, e.g., Eagle Assocs., 926 F.2d 1305 (affirming dismissal of counter-claims and cross-claims of corporate defendant who failed to retain counsel); Arch Ins. Co. v. Sky Materials Corp., No. 17-CV-2829-CBA-LB, 2021 WL 966110, at *4 (E.D.N.Y. Jan. 29, 2021) ("Where a corporate defendant has been ordered to retain counsel and fails to do so, striking a defendant's answer, including its counterclaims, is an appropriate sanction."), report and recommendation adopted, No. 17-CV-2829-CBA, 2021 WL 964948 (E.D.N.Y. Mar. 15, 2021); Northfield Ins. Co. v. Mannara Contracting Corp., No. 18-CV-6447-SJF-AYS, 2019 WL 5874063, at *2 (E.D.N.Y. Aug. 22, 2019), report and recommendation adopted, No. 18-CV-6447-SJF, 2019 WL 4291652 (E.D.N.Y. Sept. 11, 2019) (striking answer where Defendant failed to enter an appearance despite court order).

no. 80.)  Yet, more than a year after the Court-imposed deadline and the clerk's entry of default, new counsel still has not entered an appearance for Defendant, Defendant has "taken no action" to vacate the Clerk's entry of default, see Berdini, 2015 WL 5540735, at *5, and Defendant has failed to oppose Plaintiffs' Motion for Default Judgment, see Shapiro, Bernstein & Co. v. Cont'l Rec. Co., 386 F.2d 426, 427 (2d Cir. 1967) (per curiam).  Defendant's clear "lack of interest in defending this action" justifies the entry of default as a sanction, Berdini, 2015 WL 5540735, at *5, as "[s]uch cavalier disregard for a court order" constitutes a willful failure to "otherwise defend" this action under Rule 55(a).  Eagle Assocs., 926 F.2d at 1310; see also Northfield Ins. Co., 2019 WL 5874063, at *2.[9]

For the same reasons, the Court strikes Defendant's answer (docket entry no. 48 ("Answer")), including its counterclaims and affirmative defenses, as an appropriate sanction in addition to the entry of default.  See Next Proteins, Inc., 2012 WL 314871, at *2.  The striking of Defendant's Answer in its entirety, including its affirmative defenses and counterclaims, renders moot Plaintiffs' pending Motion to Dismiss Defendant's counterclaims and strike its affirmative defenses.

Once the Court determines that a default was properly entered against a party under Rule 55(a) of the Federal Rules of Civil Procedure, it must determine whether to grant default judgment in the movant's favor under Rule 55(b)(2).  A defendant who "defaults thereby admits all 'well-pleaded' factual allegations contained in the complaint," but a defaulting party does not admit conclusions of law.  City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d

---

[9]    The Court also notes that, after the undersigned received this case on transfer on April 28, 2025, the Court issued an Order (docket entry no. 97) instructing the parties to provide a status update by May 14, 2025.  Defendant also failed to respond to that Order, underscoring its lack of interest in defending this action.

114, 137 (2d Cir. 2011) (citations omitted).  Before entering a default judgment, a Court therefore must decide "whether the plaintiff has pleaded facts supported by evidence sufficient to establish the defendant's liability with respect to each cause of action asserted."  Santana v. Latino Express Restaurants, Inc., 198 F. Supp. 3d 285, 291 (S.D.N.Y. 2016); see also Finkel v. Romanowicz, 577 F.3d 79, 84 (2d Cir. 2009).

 The Court evaluates the legal sufficiency of the non-defaulting party's claims using the plausibility standard set forth in Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007), and Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), "aided by the additional step of drawing inferences in the movant's favor."  WowWee Grp. Ltd. v. Meirly, No. 18-CV-706-AJN, 2019 WL 1375470, at *5 (S.D.N.Y. Mar. 27, 2019).  If the facts and evidence presented are sufficient to establish liability, the Court then must determine the appropriate amount of damages. Santana, 198 F. Supp. 3d at 291.  This "involves two tasks: determining the proper rule for calculating damages on such a claim, and assessing plaintiff's evidence supporting the damages to be determined under this rule."  Id. (quoting Credit Lyonnais Sec. (USA), Inc. v. Alcantara, 183 F.3d 151, 155 (2d Cir. 1999)).  While the Court is not "'obligated to hold an evidentiary hearing' to determine damages, it must 'take the necessary steps to establish damages with reasonable certainty.'"  Id. (quoting Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., Div. of Ace Young Inc., 109 F.3d 105, 111 (2d Cir.1997)).

 Having concluded that the entry of default was justified, the Court must ascertain whether Plaintiffs have pleaded facts supported by evidence sufficient to establish Defendant's liability with respect to each cause of action.  Plaintiffs bring three breach of contract claims and two trademark infringement claims.  The Court will consider each claim in turn.

Breach of Contract

Plaintiffs assert three breach of contract claims based on Defendant's alleged violations of the Agreement.  First, Plaintiffs allege that Defendant failed to pay Guaranteed Royalties specified by the Agreement, including those that were past due when Flawless terminated the Agreement and additional Guaranteed Royalties that Defendant owed immediately upon the Agreement's termination ("Guaranteed Royalties Claim").  (Am. Compl. ¶¶ 62-65.)  Second, Plaintiffs allege that Defendant failed to pay required Endorsement Compensation for three Contract Quarters in 2022 ("Endorsement Compensation Claim").  (Id. ¶¶ 71.)  And third, Plaintiffs allege that Defendant failed to pay invoices for certain third parties whom it was contractually obligated to hire and compensate under the Agreement ("Personnel Compensation Claim").  (Id. ¶¶ 77-84.)  For the Guaranteed Royalties and Endorsement Compensation Claims, Plaintiffs seek monetary damages; for the Personnel Compensation Claim they seek an order of specific performance to pay outstanding invoices to third parties.

The Agreement provides that the "validity, interpretation and performance of this Agreement shall be determined in accordance with the local laws of the State of New York," so New York law governs Plaintiffs' breach of contract claims.  (Agreement § 21.)  Under New York law, a plaintiff alleging breach of contract must establish four elements: "(1) the existence of a contract between itself and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach."  Diesel Props S.r.l. v. Greystone Bus. Credit II LLC, 631 F.3d 42, 52 (2d Cir. 2011).

Because the Personnel Compensation Claim implicates threshold issues of federal jurisdiction, the Court will address it first before turning to the Guaranteed Royalties and Endorsement Compensation Claims.

<u>Personnel Compensation Claim</u>

Before the Court can conduct a default judgment analysis, the Court must satisfy itself that it has subject matter jurisdiction of Plaintiffs' claims. <u>See</u> Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."). This analysis includes consideration of standing. <u>Summers v. Earth Island Institute</u>, 555 U.S. 488, 499 (2009) ("[T]he court has an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties."). Article III of the Constitution of the United States restricts the jurisdiction of federal courts to actual cases or controversies, <u>Spokeo, Inc. v. Robins</u>, 578 U.S. 330, 338 (2016), so the Court's jurisdiction is limited to cases where "the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." <u>Warth v. Seldin</u>, 422 U.S. 490, 498-99 (1975). To establish standing, a plaintiff must show "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." <u>TransUnion LLC v. Ramirez</u>, 594 U.S. 413, 423 (2021).

Plaintiffs have not satisfied the standing requirements for their Personnel Compensation Claim. Plaintiffs allege that Defendant had a contractual obligation under the Agreement to pay the invoices of multiple third parties (<u>see</u> Am. Compl. ¶¶ 77-85 (citing Agreement §§ 4(j), 4(k), 4(s)), and argue that "Saadia breached its obligation to [Flawless] to pay

these third parties for their services" and unjustifiably avoided "performance of its obligation . . . to pay these third parties" (Pls. MDJ Mem. at 13).  While Plaintiffs have demonstrated that Saadia promised them that it would hire and compensate directly certain third parties, Plaintiffs have not proffered any facts suggesting that they were injured by Defendants' alleged breach of that obligation or that they have any standing to make injury claims on behalf of third parties who may have gone uncompensated.

Because Plaintiffs have not shown that they have a "personal stake in the outcome" of the Personnel Compensation Claim's resolution so as "to warrant [the] invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on [their] behalf," Warth, 422 U.S. at 498-99, the Court denies Plaintiffs' motion for default judgment as to the Personnel Compensation Claim.  The Court will issue a separate Order directing Plaintiffs to show cause as to (1) why this claim should not be dismissed without prejudice for lack of standing to the extent that it is premised on injuries to third parties, and (2) why, on the merits, this claim should not be dismissed for failure to state a claim upon which relief may be granted to the extent that it is premised on damages incurred by Plaintiffs.

<u>Guaranteed Royalties Claim</u>

To demonstrate their entitlement to judgment by default on the Guaranteed Royalties Claim, Plaintiffs must have pleaded facts or tendered evidence sufficient to establish all four elements of a breach of contract claim: "(1) the existence of a contract between [themselves] and [the] defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach."  <u>Diesel Props S.r.l.</u>, 631 F.3d at 52.  Here, all four elements are met by

the allegations of Plaintiffs' Amended Complaint, which are deemed admitted by virtue of Defendant's default.

It is undisputed that Flawless and Defendant entered an enforceable and valid contract in June 2021 which permitted Defendant to use Ms. Union's name, image, voice, likeness and trademark in exchange for, inter alia, guaranteed royalties.  (Am. Compl. ¶ 60; see also Agreement at 33 (signature page).)[10]  The Amended Complaint also details how Flawless "fully complied with all of its obligations under the Agreement."  (Am. Compl. ¶¶ 61.)  As it relates to the Guaranteed Royalties provision, Plaintiffs allege they performed their obligations under the contract by allowing Defendant to access Ms. Union's trademarks and other personal aspects for its GABRIELLE UNION-branded fashion lines launched at New York & Company, Lord & Taylor, and Fashion to Figure.  (Id. ¶¶ 2-3.)  Plaintiffs also plausibly allege two breaches of the Agreement related to Guaranteed Royalties.  First, Defendant failed to make four quarterly Guaranteed Royalty payments in 2022 and 2023 as required under the Agreement.  (Id. ¶ 63; see also Agreement §§ 8(a)(ii), 8(c).)  And second, once Plaintiffs terminated the Agreement on March 7, 2023 "due to non-payment of Guaranteed Royalties by [Saadia], the entire unpaid amount of the Guaranteed Royalty payable during the twelve (12) month period following the date of such termination" was due (Agreement § 8(a)(ii), and Plaintiffs allege that Defendant has not paid any of that sum (Am. Compl. ¶ 65).  Plaintiffs plausibly allege in both their Amended Complaint and their Motion for Default Judgment that they suffered damages of more than $1.6 million dollars, plus applicable interest, as a result of Defendant's breach of the Guaranteed Royalties provision.  (Id. ¶ 66; Pls. MDJ Mem. at 21.)

---

[10]     The Agreement itself is incorporated into the Amended Complaint by reference.  Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 322 (2007).

In sum, Plaintiffs have satisfied their burden of establishing Defendant's liability with respect to the Guaranteed Royalties breach of contract claim and are entitled to judgment by default on this claim.

<u>Endorsement Compensation Claim</u>

The Court further finds that Plaintiffs have established liability for Defendant's breach of the Endorsement Compensation provision of the Agreement. The signed Agreement required that, in consideration for specified Endorsement Compensation payments, Flawless supply Ms. Union to participate in the selection and curation of Collection Merchandise and to promote that Collection Merchandise through social media, photoshoots, and other media opportunities. (Agreement §§ 4(a)-(d) (discussing "Service Days and Public Relations Days" and the activities involved therein).) Plaintiffs allege that Flawless "fully complied with all of its obligations under the Agreement," including by participating, together with Ms. Union, in the design and curation of Collection Merchandise and by promoting the fashion line through social media. (Am. Compl. ¶¶ 69, 44-47.) Plaintiffs further allege that Defendant breached the Endorsement Compensation clause by failing to make three required quarterly payments (<u>Id.</u> ¶ 71), which allegedly resulted in damages in the amount of $450,513.70 plus interest (Pls. MDJ Mem. at 21). These factual allegations, which are deemed admitted by reason of default, are sufficient to plausibly establish Defendant's liability for breaching the Endorsement Compensation provisions of the Agreement and therefore justify the entry of default judgment on this claim.

<u>Damages</u>

While the allegations of a complaint pertaining to liability are deemed admitted upon entry of a default judgment, plaintiffs must provide "evidence supporting the damages"

they claim.  Santana, 198 F. Supp. 3d at 291.  Plaintiffs' Guaranteed Royalties Claim seeks two separate types of damages: (1) recovery of four unpaid quarterly Guaranteed Royalty payments that were due in 2022 and 2023 (Am. Compl. ¶ 63; see also Agreement §§ 8(a)(ii), 8(c)), and (2) Guaranteed Royalty payments for a further year following the date of termination (Am. Compl. ¶ 65, see also Agreement § 8(a)(ii)).  Plaintiffs' Endorsement Compensation Claim seeks only recovery of unpaid Endorsement Compensation payments.

The Court must consider whether the Agreement's liquidated damages clause, requiring a year of post-termination Guaranteed Royalty payments, is enforceable.  "A liquidated damages clause generally will be upheld by a court, unless the liquidated amount is a penalty because it is plainly or grossly disproportionate to the probable loss anticipated when the contract was executed."  United Air Lines, Inc. v. Austin Travel Corp., 867 F.2d 737, 740 (2d Cir. 1989) (citations omitted).  So long as liquidated damages bear a "reasonable proportion to the probable loss and the amount of the actual loss is incapable or difficult of precise estimation," liquidated damages are not a penalty.  Id. (internal quotation omitted).

Here, the Court concludes that the Agreement's liquidated damages clause is enforceable.  That clause provides that:

> In the event of termination of this Agreement due to the non-payment of Guaranteed Royalties by [Saadia], the entire unpaid amount of the Guaranteed Royalty payable during the twelve (12) month period following the date of such termination will be due and payable to [Flawless] on the date of such termination of this Agreement as if this Agreement had not been terminated.  The parties agree that such payment shall not be deemed a penalty and [Flawless] shall have no duty to mitigate its damages in the event of any such termination . . . .

(Agreement § 8(a)(ii).)

These liquidated damages bear a reasonable proportion to Plaintiffs' probable loss in the event of a breach of contract because they are tied directly to the Guaranteed Royalty

payments that Plaintiffs would have been entitled to receive over the twelve-month period following the termination of the Agreement.  Moreover, the amount of Plaintiffs' actual loss is difficult to calculate because the Agreement provided for the computation of Plaintiffs' entitlement to quarterly payment of royalties based on net sales, with the Guaranteed Royalties acting only as a minimum backstop payment.  (Agreement § 8(a)(ii).)  At the time of contracting, it would not have been possible for Plaintiffs to estimate exactly how much money they would be entitled to as payment because Plaintiffs could not precisely predict how many sales would occur in each quarter following the termination of their Agreement, which could have occurred at any time during the multi-year contract.  Because the liquidated damages clause was not a penalty and was not disproportionate to Plaintiffs' anticipated losses, the Court finds it enforceable.

Plaintiffs are therefore entitled to all of their requested relief under the Guaranteed Royalties and Endorsement Compensation Claims, including applicable interest.  Complicating this analysis, however, is the fact that Defendant made three "unannounced and unexplained payments to [Flawless] from 2021 to 2023."  (Pls. MDJ Mem. at 21.)  Plaintiffs state that the first of these payments occurred on May 13, 2021 (several weeks before the parties entered into the Agreement on June 1, 2021) and that the third was made on May 1, 2023, but Plaintiffs do not state when the second of these payments occurred.  (Id. at 22.)  It is not clear how the monetary demand in Plaintiffs' Motion for Default Judgment treats the impact of these unexplained payments on the outstanding principal and accruing interest.  (Agreement § 8(e).)  The Court will therefore refer this matter to the magistrate judge designated in this case for inquest as to the amount to be awarded to Plaintiffs for their Guaranteed Royalties and Endorsement Compensation Claims.

Trademark Infringement

Plaintiffs also bring two federal trademark claims against Saadia under the Lanham Act, 15 U.S.C. sections 1051 et seq.  Plaintiffs claim that, after they revoked Defendant's license by terminating the Agreement, Defendant's continued use of Husker's federally registered GABRIELLE UNION trademark constituted infringement of a registered trademark under 15 U.S.C. section 1114 and false designation of origin under 15 U.S.C. section 1125(a).

As the Court previously explained in its Preliminary Injunction, when a licensor terminates a trademark licensing agreement in accordance with its own terms, the continued use of that mark is unlicensed and unlawful under the Lanham Act.  (PI at 4 (citing Krispy Kreme Doughnut Corp. v. Satellite Donuts, LLC, 725 F. Supp. 2d 389, 393 (S.D.N.Y. 2010); Sunward Elecs., Inc. v. McDonald, 362 F.3d 17, 25 (2d Cir. 2004)).)  Plaintiffs have plausibly alleged that, due to Saadia's "repeated failure to make payments required under the Agreement," which constituted material breach of the Agreement, Flawless terminated the Agreement in accordance with its terms and revoked Saadia's license to sell items containing Ms. Union's name, likeness, and trademark.  (Am. Compl. ¶ 7.)  In the event of a material breach leading to termination of the Agreement under which the GABRIELLE UNION mark was licensed to Defendant, Defendant was required to "immediately cease and cause the cessation of all of its activities . . . respecting the Collection and any Materials incorporating the Artist Identification."  (Agreement § 18(b)(i).)  Yet despite the termination of the Agreement, Defendant continued to sell merchandise bearing the GABRIELLE UNION marks without authorization.  (Am. Compl. ¶¶ 92, 103.)

Because Plaintiffs have adequately pleaded that Defendant's continued use of the GABRIELLE UNION trademarks was unauthorized, the Court next must determine whether

Plaintiffs adequately plead facts supporting liability for trademark infringement and false designation of origin under 15 U.S.C. sections 1114 and 1125(a), respectively. Courts in this Circuit evaluate both claims under the same two-pronged test, which "looks first to whether the plaintiff's mark is entitled to protection, and second to whether defendant's use of the mark is likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods." Virgin Enters. Ltd. v. Nawab, 335 F.3d 141, 146 (2d Cir. 2003) (citation omitted).

When deciding whether a trademark is entitled to protection, "[a] certificate of registration with the [United States Patent and Trademark Office] is prima facie evidence that the mark is registered and valid (i.e., protectible), that the registrant owns the mark, and that the registrant has the exclusive right to use the mark in commerce." Lane Cap. Mgmt., Inc. v. Lane Cap. Mgmt., Inc., 192 F.3d 337, 345 (2d Cir. 1999). Here, Plaintiffs alleged that Husker is the owner of two federally registered trademarks for GABRIELLE UNION (Am. Compl. ¶ 90) and attached documentation of Husker's registration of these marks with the United States Patent and Trademark Office ("PTO") as Exhibit 1 to the Amended Complaint. Plaintiffs have thus established that the GABRIELLE UNION mark is "entitled to protection." See Virgin Enters. Ltd., 335 F.3d at 146.

As to the second factor, when assessing the likelihood of consumer confusion, courts in the Second Circuit typically use the eight Polaroid factors. (PI at 10 (citing Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492, 495 (2d Cir. 1961).) However, when an "ex-licensee continues to use a mark after its license expires," the "likelihood of confusion is presumed." Team Rubicon Glob., Ltd. v. Team Rubicon, Inc., No. 20-CV-2537-LTS-KNF, 2020 WL 2539117, at *6 (S.D.N.Y. May 19, 2020) (quotation and alteration omitted), aff'd, 828 F. App'x 74 (2d Cir. 2020). As explained above, Plaintiffs have adequately alleged that

Defendant continued using the GABRIELLE UNION trademark without authorization after Plaintiffs properly revoked Defendant's license.  For purposes of this default judgment motion practice, Plaintiffs' unrebutted allegation is sufficient to satisfy the consumer confusion prong.

In sum, because Plaintiffs have successfully established a prima facie case of trademark infringement under both 15 U.S.C. sections 1114 and 1125(a), the Court grants their Motion for Default Judgment with respect to these claims.

Trademark Damages, Injunctive Relief, and Attorneys' Fees

While the allegations in a complaint pertaining to liability are deemed admitted upon entry of a default judgment, plaintiffs must provide "evidence supporting the damages" for their claims.  Santana, 198 F. Supp. 3d at 291.  Here, Plaintiffs' Amended Complaint seeks damages for Defendant's trademark infringement, but their Motion for Default Judgment does not.  Plaintiffs represent that they are "unable to quantify Saadia's sales of infringing goods because Saadia failed to produce such information in this litigation and has now defaulted." (Pls. MDJ MEM at 15 n.9.)  Accordingly, Plaintiffs instead seek an injunction permanently enjoining Defendant from infringing on their GABRIELLE UNION trademark and seek attorneys' fees in connection with the entirety of this litigation.  (Id.)  For the reasons described below, the permanent injunction is granted, and the request for attorneys' fees is granted in part.

Courts may issue a permanent injunction on a motion for default if the movant shows "(1) it is entitled to injunctive relief under the applicable statute, and (2) it meets the prerequisites for the issuance of an injunction."  Mister Softee, Inc. v. Konstantakakos, No. 15-CV-4770-SJ-SMG, 2016 WL 11445964 (E.D.N.Y. June 27, 2016) (citations omitted), report and recommendation adopted, No. 15-CV-4770-SJ, 2016 WL 4250314 (E.D.N.Y. Aug. 11, 2016).  As to the first factor, in trademark cases, injunctive relief is available for "violations of 'any right

of the registrant,' including trademark infringement and false designation of origin . . . ." Id. (quoting 15 U.S.C. § 1116(a)). And as to the second factor, in this Circuit, there are four prerequisites for the issuance of an injunction: "(1) the likelihood that plaintiff will suffer irreparable harm if an injunction is not granted; (2) whether remedies at law such as monetary damages are inadequate to compensate plaintiff for that harm; (3) the balance of hardships; and (4) whether the public interest would not be disserved by a permanent injunction." Ideavillage Prods. Corp. v. OhMyGod 1, No. 18-CV-9999-RA, 2020 WL 6747033, at *4 (S.D.N.Y. Nov. 17, 2020).

Here, the Court is easily satisfied that all four requirements are met. The Court already carefully evaluated the first, third, and fourth factors when issuing its Preliminary Injunction (PI at 10-12), and the justifications it provided there apply with equal force for a permanent injunction here. See Amoco Prod. Co. v. Vill. of Gambell, AK, 480 U.S. 531, 546 n.12 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction . . . .").

As to the second factor, the Court finds that remedies at law would be inadequate here for at least two reasons. First, several of Plaintiffs' alleged harms "cannot be adequately addressed by money damages." See Mister Softee, Inc. v. Tsirkos, No. 14-CV-1975-LTS-RLE, 2015 WL 7458619, at *5 (S.D.N.Y. Nov. 23, 2015). Plaintiffs allege that Saadia's trademark infringement causes Ms. Union to suffer "loss of control of, and resultant damage to," her brand and trademark, which impairs the value of a brand that is deeply tied to Ms. Union's personal identity, name, image, and reputation. (Am. Compl. ¶¶ 96, 98.) Money alone cannot compensate Plaintiffs for the intangible irreparable harms that Saadia's continued infringement would cause to Plaintiffs' "trademark rights, business reputation, and goodwill." (Id. ¶ 95.)

Second, as a practical matter, Defendant's default makes the compensatory remedies enumerated in the Lanham Act—such as damages based on "profits that accrued to the defendant by virtue of his infringement," Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 719 (1967)—unavailable to Plaintiffs.  On a motion for default judgment, the Court can award damages only if Plaintiffs can "establish damages with reasonable certainty."  Santana, 198 F. Supp. 3d at 291 (citation omitted).  Here, however, Plaintiffs do not have access to the evidence needed to quantify the profits Defendant unlawfully accrued through its infringement because such evidence is solely within Defendant's possession, and Defendant has failed entirely to participate in this litigation.  (Pls. MDJ Mem. at 15 n.9.)  In these circumstances, a permanent injunction and attorneys' fees are likely the only remedies available to Plaintiffs.

Because Plaintiffs are entitled to injunctive relief under the Lanham Act and all four prerequisites for the issuance of a permanent injunction are satisfied, the Court grants Plaintiffs' request for a permanent injunction.  The Court will issue a separate Order that sets forth the terms of the permanent injunction.  Pending the issuance of that separate Order, the Preliminary Injunction will remain in effect.

In addition to a permanent injunction, Plaintiffs seek to recover attorneys' fees incurred throughout the course of this litigation.  The Lanham Act makes reasonable attorneys' fees available in "exceptional cases," 15 U.S.C. § 1117, which this Circuit defines as cases "'that stand[] out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated.'"  Sleepy's LLC v. Select Comfort Wholesale Corp., 909 F.3d 519, 531 (2d Cir. 2018) (quoting Octane Fitness LLC v. ICON Health & Fitness, Inc., 572 U.S. 545, 554 (2014)).  District courts evaluate the "totality of the circumstances" and consider "a wide

variety of factors, including 'frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence.'" Id. (quoting Octane Fitness, 572 U.S. at 554).

Here, the Court is convinced that, under the totality of the circumstances, this case is so exceptional as to warrant the imposition of reasonable attorneys' fees.  This is so for at least three reasons.

First, the Plaintiffs' litigating position is exceptionally strong.  Of course, because the Court has stricken Defendant's Answer, Plaintiffs' allegations are entirely unrebutted.  But even before Defendant defaulted, it never disputed that it had materially breached the Agreement and continued using the GABRIELLE UNION trademark after the Agreement's termination.  (PI at 5.)  Instead of disputing Plaintiffs' allegations, Defendant claimed that Plaintiffs materially breached the Agreement first, yet Defendant failed to provide "any evidence of having notified Plaintiffs or Union of any alleged breach" as required under the Agreement.  (Id. at 7.)  To the contrary, the only evidence Defendant ever offered actually undermined its position, as the Court previously found.  (Id.)  The Court had no trouble finding a high likelihood of success on the merits when it granted the preliminary injunction (id. at 10), and since then, Plaintiffs' relative position has only grown stronger due to Defendant's default.

Second, Defendant has litigated this case in an unreasonable manner.  This is evident from the circumstances justifying the entry of default, as explained above, including the fact that Saadia willfully failed to obey the Court's order to appear by counsel, made no move to set aside the clerk's entry of default, and failed to respond to Plaintiffs' Motion for Default Judgment.  Defendant's unreasonableness is further compounded by the fact that, as explained below, Defendant continued to sell merchandise connected to Ms. Union and her trademarks

months after the Court issued multiple Orders that unambiguously prohibited Defendant from

doing so.  Defendant also failed to respond to the Court's April 28, 2025, Order directing the

parties to provide a status update after the case was transferred to the undersigned.  (See docket

entry no. 97.)  By repeatedly flouting the Court's orders and frustrating the litigation process,

Defendant has created more work for Plaintiffs' counsel, which in turn has inflated Plaintiffs'

legal expenses over the course of this litigation.  Such exceptional disregard for the Court's

authority throughout the course of this litigation justifies an award of attorneys' fees.  See

Antetokounmpo v. Constantino, No. 21-CV-2198-JMF-JLC, 2021 WL 5916512, at *7 (S.D.N.Y.

Dec. 15, 2021), report and recommendation adopted, No. 21-CV-2198-JMF, 2022 WL 36232

(S.D.N.Y. Jan. 4, 2022).

Third, the Court is convinced that the particular circumstances of Defendant's

default justify an award of attorneys' fees as compensation for the harms Defendant caused

Plaintiffs to suffer.  As explained above, the Court cannot as a practical matter award Plaintiffs

the equitable remedies typically available under the Lanham Act, such as disgorgement of

unlawfully earned profits.  This is so because only Defendant possesses information regarding

the profits it accrued through unlawful use of Plaintiffs' trademark, and Defendant refuses to

participate in this litigation.  Defendant's default has deprived Plaintiffs of the opportunity to

pursue through discovery the evidence they would need to prove damages with adequate

specificity.  While attorneys' fees may not be a perfect substitute for the damages to which

Plaintiffs would otherwise be entitled, they are the only vehicle readily available here to

compensate Plaintiffs and deter Saadia from future misconduct.  Antetokounmpo, 2021 WL

5916512, at *8; see also Streamlight, Inc. v. Gindi, No. 18-CV-987-NG-RLM, 2019 WL

6733022, *17 (E.D.N.Y. Oct. 1, 2019) ("[C]ourts in the Second Circuit have regularly awarded

attorneys' fees against defaulting defendants under [15 U.S.C. § 1117].") report and recommendation adopted, No. 18-CV-987-NG, 2019 WL 6726152 (E.D.N.Y. Dec. 11, 2019).

      Plaintiffs appear to request that the Court award them all of the attorneys' fees they have incurred throughout the course of the litigation.  (Pls. MDJ Mem. at 22-23.)  The Second Circuit has held, however, that "[t]he prevailing party in a multi-claim case which includes both Lanham Act and non-Lanham Act counts should be entitled to attorney fees only for work expended in prosecuting or defending the Lanham Act counts."  Sleepy's LLC, 909 F.3d at 531 (emphasis in original) (quotation omitted).  The Second Circuit noted one exception to this rule—when "Lanham Act claims and non-Lanham Act claims" are "inextricably intertwined" such that it is "impossible to differentiate" between them.  Id. at 531-32 (citations omitted).  Plaintiffs have not argued that their breach of contract claims, which stem from Defendant's failure to pay them money guaranteed under the Agreement, are inextricably intertwined with Defendant's unlawful use of the GABRIELLE UNION trademark. Accordingly, the Court awards Plaintiffs reasonable attorneys' fees under the Lanham Act only for "work expended in prosecuting or defending the Lanham Act claims."  Id. at 531.  With this limiting principle in mind, the Court refers this matter to the magistrate judge designated in this case for inquest as to an appropriate award of attorneys' fees.

Cross-Motions for Sanctions

      Plaintiffs' Motion for Sanctions and Defendant's Cross-Motion for Sanctions, which were briefed before Defendant's attorneys withdrew and Defendant defaulted, are also pending before the Court.  Plaintiffs seek to hold Defendant in contempt of the Court's April 21, 2023, Temporary Restraining Order and its May 26, 2023, Preliminary Injunction and request the imposition of sanctions on Defendant for alleged violations of those court orders.  (Pls. Sanctions

Mem. at 1.)  Defendant cross-moves for sanctions based on the assertion that Plaintiffs "made no effort to notify of any noncompliance with the TRO" before filing their motion.  (Def. Sanctions Mem. at 10.)

A court may hold a party in civil contempt for violating a court order if (1) the order the party failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the party has not diligently attempted to comply in a reasonable manner.  CBS Broad. Inc. v. FilmOn.com, Inc., 814 F.3d 91, 98 (2d Cir. 2016) (citation omitted).  After holding a party in contempt, a court may impose sanctions.  "The imposition of civil contempt sanctions may serve dual purposes: to secure future compliance with court orders and to compensate the party that has been wronged."  Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc., 369 F.3d 645, 657 (2d Cir. 2004).  For coercive contempt sanctions, the court has "broad discretion to design a remedy that will bring about compliance," whereas "some proof of loss must be present to justify" compensatory sanctions.  Id. at 657-58.  The movant "need not . . . establish[] that the violation was willful" to find a party in contempt, id. at 655 (citations omitted), but "a finding of willfulness strongly supports granting" attorneys' fees and other reasonable legal costs as compensation for contemptuous misconduct, Weitzman v. Stein, 98 F.3d 717, 719 (2d Cir. 1996).

Civil Contempt

Here, Plaintiffs point to two categories of alleged violations on two different websites, and the Court must consider whether the Preliminary Injunction and the Temporary Restraining Order were unambiguous as to each.  Specifically, Plaintiffs argue that, in November 2023, Defendant violated the Court's orders by (1) continuing to use Gabrielle Union's name when selling merchandise on its New York & Company website, and (2) selling merchandise

connected with Gabrielle Union, including merchandise containing sewn-in GABRIELLE UNION tags, through a clothing subscription service called New York & Company Closet ("Closet").  (Docket entry no. 63 ¶¶ 8-10.)

The Preliminary Injunction, which extended the terms of the Temporary Restraining Order through the pendency of this litigation, clearly barred Defendant from continuing to use Ms. Union's name in connection with merchandise sold on the New York & Company website.[11]  The Temporary Restraining Order restrained Defendant from using any "mark, word, name or symbol confusingly similar to the GABRIELLE UNION mark," including "any use of the name 'Gabrielle Union.'"  (TRO at 1.)  It also restrained Defendant from "any other conduct that falsely suggests an ongoing association between Plaintiffs or their goods, on the one hand, and Defendant and its goods, on the other."  (Id.)  The Court specifically ordered Defendant to remove "all references to Plaintiffs' intellectual property from any website on which Collection Merchandise is sold," including a specific requirement that such references be removed from New York & Company's website, www.nyandcompany.com, within three business days of the Temporary Restraining Order's entry on April 21, 2023.  (Id. at 1-2.)  Nonetheless, Defendant continued to use Ms. Union's name in connection with merchandise on the New York & Company website in November 2023, thereby clearly violating the Court's unambiguous orders.  Defendant's motion papers appeared to acknowledge that unambiguous prohibition, recognizing that "the TRO at hand specifically names three (3) websites," including New York & Company's website.  (Def. Sanctions Mem. at 6.)

---

[11]     Because the Preliminary Injunction adopted the same "restraints set forth in the Temporary Restraining Order" (PI at 13), the Court's analysis of the terms of the Temporary Restraining Order equally applies to the Preliminary Injunction.

The Preliminary Injunction also clearly and unambiguously barred Defendant from selling merchandise connected to Ms. Union on the Closet website. Defendant claims that Closet merchandise is not subject to the Preliminary Injunction and Temporary Restraining Order because Closet "is a site for RECYCLED clothing and apparel" and that the Temporary Restraining Order's terms were "unclear as to whether a website platform that recycles, rents, and gives option to purchase used items is subjected to the Order." (Def. Sanctions Mem. at 6.) Defendant's arguments are unavailing because the Temporary Restraining Order unambiguously prohibits Defendant from making "any further use" of the GABRIELLE UNION trademark, "any use of the name 'Gabrielle Union'" in connection with Defendant's goods, and the manufacturing, distribution, or sale of "any Collection Merchandise" unless its sewn-in labels and tags were "fully removed." (TRO at 1-3 (emphases added).) And while Defendant is correct that Closet is not among the three websites the Temporary Restraining Order mentioned by name with expedited compliance timelines, the Order required Defendant to remove "all references to Plaintiffs' intellectual property" from "any website on which Collection Merchandise is sold . . . within ten (10) business days" of the Temporary Restraining Order's entry. (TRO at 2 (emphasis added).)

Defendant's submissions in connection with the injunctive relief and contempt proceedings thus fail to persuade the Court that any ambiguity existed as to the permissibility of its sales on the Closet website. The Temporary Restraining Order could not have been clearer in directing Defendant to cease "any" further sale of offending goods on "any" of Defendant's websites. This necessarily includes recycled goods on the Closet website. Because the Temporary Restraining Order "leaves no doubt in the minds of those to whom it was addressed" that Defendant was prohibited from the sale of all Collection Merchandise referencing Ms.

Union or her trademark on all websites, see CBS Broad. Inc. v. FilmOn.com, Inc., 814 F.3d 91,

98 (2d Cir. 2016) (internal quotations omitted), the Court finds that the first contempt factor is

satisfied.

As to the second contempt factor, the Court finds that the evidence of Defendant's

noncompliance was clear and convincing.  To establish violations on the New York & Company

website, Plaintiffs provided an exhibit compiling twenty-five screenshots of the New York &

Company website taken by a Pryor Cashman LLP paralegal on November 20, 2023, each of

which contained references to Gabrielle Union's name and trademark.  (Docket entry no. 63-2;

see also docket entry nos. 63, 75.)  Defendant did not dispute that this evidence demonstrates

clear violations of the TRO.

To demonstrate that Defendant's sales on the Closet website violated the

Temporary Restraining Order, Plaintiffs provided two forms of evidence.  First, they provided

the aforementioned exhibit compiling screenshots of the Closet website that showed twenty-four

references to Gabrielle Union's name and trademark.  (Docket entry no. 63-1.)  And second,

Plaintiffs provided a declaration of a private investigator, Maxine Kaplan, whom Plaintiffs

instructed to order three pieces of Collection Merchandise from the Closet website on November

17, 2023.  (Docket entry no. 64 ("Kaplan. Decl.").)  Attached as exhibits to the Kaplan

declaration are screenshots of the Closet website listings of these items, screenshots of Kaplan's

order confirmations, and photos of the items themselves after Kaplan received them on

November 27, 2023.  (Docket entry nos. 64-1, 64-2, 64-3.)  The listings for these three items

each contained at least one unambiguous reference to Gabrielle Union (docket entry no. 64-1),

and the physical items that Kaplan received clearly contained sewn-in Gabrielle Union tags

(docket entry no. 64-3).

Plaintiffs thus presented clear and convincing evidence that Defendant continued using Gabrielle Union's name, image, and trademark when selling Collection Merchandise almost <u>seven</u> months after the Court enjoined such uses. Defendant's arguments to the contrary are unavailing. Defendant contests the admissibility of Plaintiffs' screenshot compilations, but Plaintiffs have certified by declaration made under penalty of perjury that these exhibits were "true and correct" copies of screenshots captured by a Pryor Cashman LLP paralegal on November 20, 2023. (Docket entry nos. 63, 75.) This is sufficient to establish the authenticity of the screenshots, as Defendant's own cited case law shows.[12] Defendant's conjecture that Ms. Kaplan was inadequately qualified to "act as a trademark infringement or ecommerce investigator" is similarly unavailing. (Def. Sanctions Mem. at 5.) Ms. Kaplan makes no conclusions about infringement; rather, her declaration describes and documents the process of purchasing Collection Merchandise from the Closet website the way an ordinary consumer would. (<u>See</u> docket entry no. 64 ("Kaplan Decl.").) The Court has no reason to doubt the authenticity of her declaration or the validity of the information contained therein.

Notably, far from denying that it continued selling unlicensed merchandise in violation of the Temporary Restraining Order, Defendant appears to concede this fact when arguing the third contempt factor, Defendant's diligent attempt to comply. Defendant concedes that "some of the items . . . may have fallen through the cracks" (docket entry no. 72 ¶ 6), and that "there were a few residual items . . . with the label bearing Ms. Union's name" (docket entry

---

[12]     <u>See</u> <u>LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.</u>, 209 F. Supp. 3d 612, 663 n.75 (S.D.N.Y. 2016), <u>aff'd sub nom.</u> <u>LVL XIII Brands, Inc. v. Louis Vuitton Malletier SA</u>, 720 F. App'x 24 (2d Cir. 2017); <u>Really Good Stuff, LLC v. BAP Invs., L.C.</u>, No. 19-CV-2218-LLS-GWG, 2021 WL 2469707, at *4 (S.D.N.Y. June 17, 2021); <u>see also</u> <u>Riverkeeper, Inc. v. Brooklyn Ready Mix Concrete, LLC</u>, No. 14-CV-1055-NGG-SMG, 2016 WL 4384716, at *3 (E.D.N.Y. Aug. 16, 2016).

no. 71 ("Saadia Decl.") ¶ 13), and proffers that, "as soon as any Gabrielle Union label is discovered, [Jack Saadia] has directed they be immediately removed" (Def. Sanctions Mem. at 6). These concessions bolster the clear and convincing evidence of Defendant's noncompliance and do not persuade the Court that Defendant diligently attempted to comply with the Temporary Restraining Order. As Plaintiffs correctly note, Defendant does not provide a single piece of evidence other than the conclusory statement by its CEO—no memorandum, email, text message, or any other document or communication—suggesting it made any attempt, much less a diligent attempt, to comply with the Temporary Restraining Order at the time it was entered. (Docket entry no. 74 ("Pls. Sanctions Reply") at 9 (citing Saadia Decl. ¶ 14).) At most, Defendant's declarations show a belated attempt to comply with the Temporary Restraining Order seven months <u>after</u> that Order's entry and a month after Plaintiffs moved for sanctions. Such efforts were too little, too late, and the Court thus has no difficulty concluding that Defendant failed to diligently attempt to comply with the Temporary Restraining Order.

Because all three contempt factors are met here, the Court holds Defendant in contempt of the Temporary Restraining Order and the Preliminary Injunction.

<u>Attorneys' Fees for Contempt</u>

Having held Defendant in contempt of the Temporary Restraining Order and the Preliminary Injunction, the Court now turns to the issue of attorneys' fees and sanctions. District courts have discretion to award appropriate attorneys' fees and costs to the victims of contempt and are especially likely to do so when the violation of the Court's order was willful. <u>Weitzman</u>, 98 F.3d at 719 ("[T]o survive review in this court, a district court, having found willful contempt, would need to articulate persuasive grounds for any denial of compensation for the reasonable legal costs of the victim of contempt."). "A willful contempt is one where the contemnor had

actual notice of the court's order, was able to comply with it, did not seek to have it modified, and did not make a good faith effort to comply." Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp., No. 06-CV-0085-LBS, 2007 WL 2982295, at *4 (S.D.N.Y. Oct. 10, 2007) (internal quotation omitted). "The burden of proving 'plainly and unmistakably' that compliance is impossible rests with the contemnor," In re Marc Rich & Co., A.G., 736 F.2d 864, 866 (2d Cir. 1984) (citation omitted), and "[t]he court is not required to credit the alleged contemnor's denials if it finds them to be incredible in context," Huber v. Marine Midland Bank, 51 F.3d 5, 10 (2d Cir. 1995) (internal quotations omitted).

Here, the Court concludes that the record plainly shows that Defendant willfully violated the Court's Orders and that an additional award of attorneys' fees, separate from the attorneys' fees awarded for Defendant's default under the Lanham Act, is warranted as a sanction for Defendant's contemptuous conduct. Defendant undoubtedly had notice of the Court's Temporary Restraining Order shortly after its issuance on April 21, 2023—Defendant's CEO, Jack Saadia, declared that Saadia had "removed all references to Plaintiffs' intellectual property from any website on which Collection Merchandise is sold" by May 1, 2023, and specifically affirmed that Saadia removed such references from New York & Company's website. (Docket entry no. 41 ¶ 3.) And in opposing Plaintiffs' Motion for Sanctions, Saadia declared that he "understood that we were to 'remove all references to Gabrielle Union from any website on which Collection Merchandise is sold." (Saadia Decl. ¶ 8-9 (emphasis added).) Yet in December 2023, Mr. Saadia justified Defendant's noncompliance by claiming, under penalty of perjury, that he was somehow "unaware that recycled, rental and sale of used clothing" on Closet's website was barred by the Temporary Restraining Order (Saadia Decl. ¶ 8), even though that Order prohibited any further sale of Collection Merchandise on any website Defendant

controlled.  The Court finds Defendant's excuses for noncompliance based on feigned lack of awareness—nearly eight months after Defendant had purported to be in full compliance—"incredible in context" and does not credit them.  See Huber, 51 F.3d at 10.

As the victims of Defendant's contempt, Plaintiffs are therefore entitled to a reasonable award of their legal fees incurred in prosecuting the contempt motion practice. Weitzman, 98 F.3d at 719.  The Court refers this matter to the designated magistrate judge for inquest regarding an "award of reasonable attorneys' fees and costs incurred in the prosecution of [Plaintiffs'] motion for contempt."  See JLM Couture, Inc. v. Gutman, No. 20 CV 10575-LTS-SLC, 2023 WL 3061924, at *1 (S.D.N.Y. Apr. 24, 2023).

Defendant's Cross-Motion

In response to Plaintiffs' Motion for Sanctions, Defendant cross-moves for sanctions, arguing that "Plaintiffs made no effort to notify of any noncompliance with the TRO." (Def. Cross-Sanctions Mot. at 10.)  Defendant does not point to any legal authority suggesting that Plaintiffs had such an obligation and instead cites, without explanation or analysis, Rule 11 of the Federal Rules of Civil Procedure.  (Id. at 10-11.)  While it is true that Rule 11(c)(2) requires that the moving party provide the non-movant with twenty-one days to cure any defects, Plaintiffs did not move for Rule 11 sanctions.  Rule 11 sanctions concern the veracity and propriety of representations made to the court, whereas "the power to punish for contempt is an inherent power of the federal courts."  People by Abrams v. Terry, 45 F.3d 17, 23 (2d Cir. 1995) (citing Chambers v. NASCO, Inc., 501 U.S. 32, 43 (1991)).  Defendants cite no authority suggesting that prior notice is a prerequisite to filing of a motion for sanctions pursuant to the Court's contempt power, and the Court is unaware of any such requirement.  Nor does Defendant provide any valid argument that Plaintiffs' motion was "being presented for any improper

purpose" such that Defendant itself would be entitled to Rule 11 sanctions. (Def. Cross-Sanctions Mem. at 10 (citing Fed. R. Civ. P. 11(b)).) Plaintiffs filed their Motion for Sanctions because Defendant violated multiple court Orders, not because they sought to "harass, cause unnecessary delay, or needlessly increase the cost of litigation." Fed. R. Civ. P. 11(b). Defendant's Cross-Motions for Sanctions is therefore denied.

CONCLUSION

For the foregoing reasons, Defendant's Answer is stricken in its entirety in light of Defendants' default, and Plaintiffs' Motion to Dismiss is accordingly terminated as moot. Plaintiffs' Motion for Default Judgment is granted as to their claims of breach of contract based on the Guaranteed Royalties and Endorsement Compensation clauses, and it is further granted as to their trademark infringement claims. The motion for default judgment is denied as to the Personnel Compensation Claim. Plaintiffs will be directed to show cause as to why, in light of the analysis set forth in this Memorandum Opinion and Order regarding the Personnel Compensation Claim, that claim should not be dismissed for lack of standing, as to damages incurred by the third party vendors, and for failure to state a damages claim upon which relief can be granted, as to Plaintiffs.

Plaintiffs' Motion for Sanctions is granted in part and denied in part, and Defendant's Cross-Motion for Sanctions is denied in its entirety. The Court will separately issue an Order setting forth the terms of the permanent injunction; pending the entry of that Order, the Preliminary Injunction remains in effect. This Memorandum Opinion and Order resolves docket entry nos. 54, 62, 69, and 86.

This case is hereby referred to Magistrate Judge Jennifer Willis for inquest to determine (1) the amount of Guaranteed Royalties and Endorsement Compensation, with interest

thereon, that is outstanding; (2) a reasonable award for attorneys' fees incurred in prosecuting Plaintiffs' claims under the Lanham Act; and (3) a reasonable award of attorneys' fees that Plaintiffs incurred in prosecuting the contempt motion.

       SO ORDERED.

Dated: September 29, 2025
      New York, New York

                          /s/ Laura Taylor Swain

                         LAURA TAYLOR SWAIN
                         Chief United States District Judge